By the Court,

Nelson, Ch. J.
The statute (1. R. S. 315, 9 8, 2d ed.) provides that the commissary general shall keep in good repair, the arsenals and magazines of the state, and attend to the due preservation, safe-keeping, &c. of arms, accoutrements, ammunition, &c.; and shall at all times have the control and disposition of the same for that purpose. By the next two sections he is authorized, under certain limitations, to sell out of the arsenals to any citizen of this state belonging to the militia, a musket and bayonet, with the necessary equipments ; and generally, to sell all damaged powder, arms and munitions of war, deemed unsuitable for the use of the state. Beyond this, he has no authority to sell, or otherwise dispose of the public property in his custody.
Conceding then, that the loan of the arms to the plaintiffs was made without authority and in violation of the law, does this make the bond given to the state for their return, illegal and void 1 All contracts which have for their object any thing repugnant to justice, or against the general policy of the common law, or contrary to the provisions of any statute, are void. Ex turpi contractu, actio non oritur.
In this case it will be seen, that the act of loaning the arms was not against any positive statute. The ground of defence must, therefore, rest mainly upon the violation of official duty by the commissary general, he having no right by law to do the act. Thei’e is nothing on the face of the instrument, that necessarily leads to this result. It imports, that arms have been procured for temporary use, from the state, by the authorities of the city, for the defence and preservation of the latter; and contains a stipulation for *438 replacing them in the public arsenal, when demanded. If, therefore, there be any authority in any department of the government thus to accommodate the plaintiffs, we are bound to assume the act of loaning to have been lawful, unless we go out of the bond, for the purpose of ascertaining the true state of the transaction, which, I admit, is always competent when illegality of consideration is urged in defence. On going out of the bond then, we find that the arms were not loaned by the commissary general, but by the agent who had the immediate charge of the property, and who is not a public officer. The statute makes no provision for the appointment of deputies by the commissary general; and as a general rule, that authority does not exist unless specially conferred; (1 Tomlins' Law Diet. 542, tit. Deputy ;) particularly not, where the duties of the office involve trust, skill and confidence. (5 Com. Dig. tit. Officer, D. 2; 5 Bac. Abr. tit. Offices and Of. ficers, L; Earl of Shrevjsbury's case, 9 Co. 48, 49.) Even if the act of loaning by the commissary general himself, therefore, would have been such a flagrant, violation of law, and of his official oath, as not to have afforded ground for a valid contract, upon the principle that ex dola malo ñon oritur actio (in regard to which point we give no opinion) the rule has no application here; for in this case the loan was but the' act of a private individual, dealing with the property of another without authority, and taking a bond to the owner, by way of security for its re-delivery. There can be no doubt, in such a case, that the real owner may waive the tort committed upon the property, and seek a remedy upon the bond.
Independently of this view, if it be conceded that the loan was made by the commissary general, inasmuch as there is no statute prohibiting the act, I very much doubt if it can be regarded' as belonging to that species of illegality which would necessarily avoid the contract, and prevent the state from recovering upon it. The act is a clear excess of authority, but not a violation of any posh *439 tive law. Being clearly beyond the scope of the powers of the officer, the state might have avoided the contract and sued directly for the property; but, if only voidable, she may affirm the act, and take her remedy accordingly. The loan, under the circumstances, might well, I think, be regarded simply in the light of an excess of authority, rather than a criminal and corrupt violation of law and duty. (Nobree v. Napier, 2 Bing. N. C. 796; Chitty on Cont. 657, 3d Bond, ed.) But it is unnecessary to express any definitive opinion upon this point.
It is said, that the common, council of the city had no power to authorize their agents to bind the corporation by bond in this case. The general power conferred upon all corporations in the state, includes that of purchasing and holding such personal estate as the purposes of the body shall require; (1 R. S. 602, § 1, sub. 4, 2d ed.;) and by the charter of the city of Buffalo, (Sess. Laws 1832, p. 303, § 31,) the common council have the control of all such property belonging to the corporation. They have power to make and establish rules and by-laws for the purpose, among other things, of preventing any riot, noise, disturbance, or disorderly assemblages; (id. p. 304, § 31, sub. 7;) and also possess a general power to make all such ordinances, by-laws, and police regulations, not contrary to the laws of the state, for the good government of the city, &c. and as may be necessary to carry into effect the powers conferred by the charter. (Id. p. 306, § 33.) It cannot, I think, be doubted that abundant authority may be found in the above provisions, to justify the common council in passing the resolution of the 29th December, 1837, by which they authorized the acting mayor to take such measures as he might deem necessary for the safety and defence of the city, with a view of guarding against any incendiary or other attempts upon the persons and property of the citizens, and to bind the city by bond or otherwise, to procure arms or obtain any thing by him deemed necessary to carry the resolution into effect. These arms, it appears, were deemed essential at the time, by *440 the public authorities of Buffalo, to preserve the peace and security of the city, and to protect the lives and property of its inhabitants from incendiary and predatory attacks; or,, in the language of the charter, “to prevent disturbances and disorderly assemblages, and maintain the good government of the city.”
It is also urged that Barker,"who signed the bond as acting mayor, was ineligible to that office, and disabled from acting as such at the time, for the reason that the charter prohibits the appointment of an alderman to that office. (JSess. Laws 1832, p. 301, § 20.) A sufficient answer to this argument is, that the act to amend the charter, (iSess. L. of 1835, p. 94, § 1,) provides, that the presiding officer' of the common council, during a vacancy in the office of mayor, &c. shall possess all the powers, and perform ail the duties of that office. He was not appointed mayor, but acted by virtue of the powers 'thus conferred upon him as presiding officer of the board.
I am. therefore of opinion that the judge properly refused to nonsuit the plaintiffs, and that the motion for a new trial should be denied.
New trial denied.